UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 19-305 (NEB/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA,      )<br>)<br>Plaintiff,      )<br>)<br>v.      )<br>)<br>NEERAJ CHOPRA,      )<br>)<br>Defendant.      ) | **DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENT** |

## INTRODUCTION

On January 24, 2020, Mr. Chopra filed *Defendant's Motion to Suppress Statement* [Dkt #21] and *Defendant's Pre-Hearing Memorandum in Support of Motion to Suppress Statement* [Dkt #22]. On October 2, 2020, this Court held a Motions Hearing where the State presented the testimony of FBI Special Agent Marc Rensch. The Court ordered a briefing schedule with Mr. Chopra's brief due on October 30, 2020 and the government's brief due on November 13, 2020.

## ISSUE

The sole issue is whether Mr. Chopra's statement should be suppressed as a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny.

## FACTS

At the October 2, 2020 Motions Hearing, FBI Special Agent Marc Rensch ("Agent Rensch") was the only witness to testify.

**Direct Examination**

On direct examination, Agent Rensch testified that he has worked as an FBI agent for nearly 22 years and has been assigned to the Minneapolis International Airport for approximately

six years (Tr. 10). He estimated that he has conducted almost 100 witness and suspect interviews in the previous six years (Tr. 11).

During the evening of April 8, 2019, Agent Rensch was notified by the Airport Police of an assault incident on a plane (Tr. 11). He then responded to Terminal 2 of the airport (Tr. 11). He first went to the Airport Police Operations Center and briefly learned about what had occurred (Tr. 12). He learned that one male passenger had sexually assaulted another male passenger seated next to him (Tr. 12). Agent Rensch then met with the alleged victim for approximately an hour "to gather a baseline of facts and more detailed information about what had occurred on board the aircraft" (Tr. 12–13). While Agent Rensch met with the alleged victim, he knew that Mr. Chopra was waiting to be interviewed (Tr. 13). After the interview with the alleged victim, Agent Rensch met with Mr. Chopra in the Police Operations Center of the airport in Terminal 2 (Tr. 13). The Police Operations Center is similar to a police station (Tr. 13). Agent Rensch met with Mr. Chopra in an interview room:

> It's a small room. It has no exterior windows or windows to the exterior. It does -- it has a locking metal door. The metal door does have a window in it. It's carpeted. It has a permanently affixed bench-type seat and a permanently affixed table. And then it also in this particular room had a removable chair.

(Tr. 14). The room also had cameras (Tr. 14). During the interview of Mr. Chopra by Agent Rensch, Airport Police Officer Abbie Annen was also present (Tr. 15). Upon entering the room, Agent Rensch introduced himself and showed his FBI credentials (Tr. 16). Agent Rensch told Mr. Chopra that he was there to hear what he had to say about an incident on the plane (Tr. 16). Agent Rensch described Mr. Chopra as attentive, not appearing surprised, and making eye contact (Tr. 16).

2

Then, Agent Rensch read Mr. Chopra his *Miranda* rights from a form (Tr. 17). Agent Rensch put the form sideways on the table between him and Mr. Chopra so they could both read it:

> I took it out of my briefcase. I placed it on the tabletop that was between Mr. Chopra and myself. I referred to it as his advice of rights, and I informed him that I was going to read these advice of rights to him and that if he could possibly follow along. In order to assist him in following along, I turned the form in a sideways manner so he could look and read along with me as I read and as I pointed to each sentence of it. I read verbatim and pointed to each sentence as I read it, and it appeared to me that Mr. Chopra was following along as I read each sentence.

(Tr. 17–18). The form read:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during the questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions without a lawyer present, you have the right to stop answering at any time.

(Tr. 18–19). Agent Rensch testified that he read the rights out loud and that Mr. Chopra followed along with him (Tr. 19). He also testified that he understood Mr. Chopra to be literate in English and appeared to track what Agent Rensch said (Tr. 19). The final sentence read, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present" (Tr. 20). Mr. Chopra signed on the signature line without asking questions, without hesitating, without asking for an attorney, and without asking that anything be repeated (Tr. 20–21).

Agent Rensch stated that his demeanor during the interview was relaxed and not intimidating (Tr. 21). He was not in a uniform and did not have handcuffs, but he did have his handgun, which he did not take out or brandish (Tr. 21–22). Agent Rensch described Mr. Chopra as nervous, not handcuffed, and said he had felt claustrophobic and was stressed out (Tr. 22). Agent Rensch denied that Mr. Chopra had any trouble breathing (Tr. 23). Mr. Chopra had a cup of water but denied needing a refill (Tr. 23). Mr. Chopra never asked for more water, never asked to use the restroom, and never asked to take a break (Tr. 23–24). Mr. Chopra told Agent Rensch that he was very tired while on the plane, but he did not appear tired during the interview: Agent Rensch did not observe any yawning, dozing off, or slumping (Tr. 24). Mr. Chopra seemed eager to answer the questions, wanted to tell his side, and appeared engaged (Tr. 24–25). He did not hesitate before answering questions and answered questions in a way that made sense (Tr. 25). He was given adequate time to provide answers and used body movements to illustrate what happened (Tr. 26). Agent Rensch denied that Mr. Chopra was visibly shaking or appeared disoriented (Tr. 26). The interview lasted approximately 30 minutes (Tr. 27). During that time, Mr. Chopra did not state that he did not understand a question or his rights, nor did he ask Agent Rensch to repeat himself, ask for an attorney, ask for a break, ask to end the interview, refuse to answer a question, or hesitate before answering a question (Tr. 27–28).

**Cross-Examination**

On cross-examination, Agent Rensch could not provide the time the plane landed, how much time passed from when the plane landed to when he went to speak with the alleged victim, or what time that interview took place (Tr. 28–29). During this time, Mr. Chopra was "being held" in the Police Operations Center (Tr. 29–30). While he denied that there was on ongoing criminal investigation when the plane landed, Agent Rensch did admit that he had decided the

investigate because the report was of an assault and an assault is a crime (Tr. 30). He admitted he was going to investigate a suspected crime (Tr. 30–31). He also admitted that he later found out that Mr. Chopra had been booked and fingerprinted (Tr. 32).

Agent Rensch testified that during the interview, Officer Annen was dressed in her uniform, was armed with a gun, and looked like a law enforcement officer (Tr. 32–33). Regarding the room:

> Q. Okay. Just to get some more details about the room Mr. Chopra was waiting in, you said it was a small room?
> A. Yes.
> Q. It appeared from the video that it was painted a sort of whitish color; is that right?
> A. I don't recall.
> Q. There's one door?
> A. Correct.
> Q. The door was locked?
> A. Yes.
> Q. No way for Mr. Chopra to leave that room?
> A. Correct.
> Q. No exterior windows, right?
> A. Yes.

(Tr. 33).[1] Further, Mr. Chopra was not free to leave the room (Tr. 34). Then, the following exchange occurred:

> Q. Could you understand how being in a very small room with someone stating that they had been claustrophobic with two law enforcement officers might be intimidating to someone in Mr. Chopra's situation?
> A. I can understand that.

(Tr. 35).

Regarding the days leading up to the flight, the following exchange occurred:

> Q. Okay. Thank you. And you learned that he was in D.C. attending his MBA classes at Cornell?
> A. Yes.

---

[1] There was a discussion of whether Mr. Chopra was handcuffed. Upon another review of the video, it is apparent that Mr. Chopra was not handcuffed. Mr. Chopra had a watch on one hand and a bracelet on the other, which created the appearance of handcuffs.

Q. You learned that he was a graduate student?
A. Yes.
Q. And that he had attended his friend's birthday party Saturday night?
A. Yes.
Q. And he told you that he stayed up late for that party?
A. Yes.
Q. Told you that he didn't get much sleep?
A. Yes.
Q. And he told you he had MBA classes all day on Sunday?
A. It was my understanding that that's when he was -- his arrangements were to fly back on Sunday.
Q. Did he tell you that he had classes that afternoon?
A. I don't recall.
Q. Would it refresh your recollection if I showed you the transcript?
A. Yes, it would.
. . .
Q. Okay. So did he tell you that he had classes on Sunday?
A. Yes.
Q. And after the classes, he went to the airport?
A. Yes.
Q. And he learned that his flight was changed?
A. Yes.
Q. And he stated to you during the interview that his flight was delayed several times?
A. Yes.
Q. He stated that he stayed all night long Sunday night in the airport?
A. Yes.
Q. He didn't stay at a hotel?
A. He did not.
Q. He told you he tried to sleep on an airport chair but couldn't?
A. Yes.
Q. He told you he couldn't get any sleep that night?
A. Yes.
Q. And after staying up all night, he flew from D.C. to Boston at about 5:30 a.m.?
A. Yes.
Q. And he reached Boston about 7:00 a.m.?
A. I believe so.
Q. And then he flew to Minneapolis in the afternoon?
A. Yes.
Q. And that would have been Monday afternoon?
A. Correct.
Q. April 10th?
A. I believe it was still April 8th.
Q. And he told you and Police Officer Annen that he basically hadn't slept in two days, right?

> A. That's what he was referring to.
> Q. Okay.
> A. He did say he slept on the flight from D.C. to Boston.

(Tr. 36–37, 39–40). Agent Rensch admitted that Mr. Chopra had been claustrophobic in the interview room (Tr. 40). At one point in the interview, Mr. Chopra was crying and said he was stressed out and tired (Tr. 41).

Regarding Mr. Chopra's *Miranda* rights:

> Q. And you read the rights to him verbatim on that statement?
> A. I did.
> Q. And you read to him the *Miranda* rights while it was sideways --
> A. Yes.
> Q. -- you said the paper was sideways?
> A. Yes.
> Q. So you didn't turn it to him so he could read it directly as I'm reading this page right now, right?
> A. I'm sorry. Sir, could you --
> Q. Sure.
> A. -- say the question again?
> Q. You didn't put the form in front of him like I'm doing now so he could just read it, he had to turn his head to look at it sideways, right?
> A. Correct, as did I.
> . . .
> Q. Okay. Do you have any idea whether Mr. Chopra had ever been read his *Miranda* rights before?
> A. At that time I did not.
> Q. Okay. And at any point in time did you ever ask him if he understood those rights?
> A. As it reads in the advice of *Miranda* rights, it does ask if he understood.
> Q. Did you ever ask him is what I'm asking. Did you ever ask him, "Do you understand these *Miranda* rights?"
> A. No.
> Q. Did he ever tell you that he understood these rights?
> A. No.
> Q. He never told you that he did not want to speak with a lawyer, true? That's a poor question. You don't have to answer that.
> You never actually asked him if he wanted to speak with an attorney, correct?
> A. No.
> Q. You never asked him if he was signing these documents voluntarily?
> A. No.
> Q. You never asked him if he waived these rights?

7

| | |
|---|---|
| A. | Other than what is on the form, no. |
| Q. | You never -- he never, Mr. Chopra never verbally told you he was waiving these rights, correct? |
| A. | Not verbally. |
| Q. | The only thing you said is: "If you want to talk to me about that, I just need you to sign it right there," correct? |
| A. | Correct. |
| Q. | And then he quickly signed it? |
| A. | Yes. |
| Q. | Do you have any idea if he understood those Miranda rights that night? |
| A. | I believe that he did. |
| Q. | But you believe. You're assuming that, correct? |
| A. | Based on my experience, I believe that he understood the rights that evening. |
| Q. | But you don't know because you never asked him, true? You're speculating? |
| A. | I'm not speculating. |
| Q. | Could you read Mr. Chopra's mind? |
| A. | No. |
| Q. | So you don't know fully, with 100 percent confidence that he understood those rights? |
| A. | No. |

(Tr. 42, 43–45).

**Redirect Examination**

On redirect examination, Agent Rensch testified that he was notified of the incident after the plane had landed, and it took him 20–30 minutes to head to Terminal 2 (Tr. 45–46). He stated that Mr. Chopra's discussion of being tired was related to his time on the plane, not his time in the interview room (Tr. 48–49).

**Recross-Examination**

On recross examination, Agent Rensch testified that Mr. Chopra stated that he had not had much sleep, that he was tired and stressed out, that he was crying at some point, and that he had had very little sleep in two days (Tr. 51–52).

**Video of Interview (Exhibit 2)**

A review of Exhibit 2—the video recording of Mr. Chopra's interview—shows that Agent Rensch placed the paper containing the rights on the table and turned it so that it was not equally readable by both him and Mr. Chopra; the paper was turned more towards Agent Rensch, who would have been able to read them easily. Mr. Chopra, however, even with his head tilted, would have seen the paper at a significant angle. In addition, Agent Rensch read the rights quickly—in 29 seconds.[2] He stated:

> MR: OK . . . so, today's date is April 8th, 2019, it is 8:28 p.m. Alright. So, before we ask you any questions, I'm going to read you your rights, okay? And let you know what those are. I'm gonna read them to you, maybe you can just follow along . . . . before we ask you any questions you must understand your rights, you have the right to remain silent, anything you say can be used against you in court, you have a right to talk to a lawyer for advice before we ask you any questions, you have the right to have a lawyer with you during the questioning, if you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. I have read this statement of my rights and I understand what my rights are, at this time, I'm willing to answer questions without a lawyer present. So why we're here today is because we want to find out why we're here. Why are we all here, what happened. Ok? Simple as that. Your side of the story. Alright? That's why I'm here, that's they came, they asked me to come out here and talk to you. So, if it's, ah, if you wanna talk to me about that, I just need you to sign right there…
>
> NC: Sure.

(Exhibit 3, p. 2). Then:

> MR: [pause] Alright. [pause] Ok. I've got 8:29. [pause] I see you've got some water there. That's good. Do you need a refresher on that? You need some more water or anything?
>
> NC: I — I feel — I was feeling very claustrophobic in the room.
>
> MR: In, in this room?

---

[2] See 11:33–12:02 minutes into the video of the interview.

9

NC: Yeah.

MR: Yeah, it's kind of a small room. Hopefully it's better now that we're in here with you, right?

NC: Sure.

MR: Or does it make it look, feel smaller? [laugh]

NC: No, I'm . . . I'm stressed out.

MR: Ok.

NC: This is —

MR: Alright, I'll, I won't keep you, we'll just get right to the point and just find out what happened, ok? Um, can you spell your last name for me?

(Exhibit 3, p. 2).

## **ARGUMENT**

To admit Mr. Chopra's April 8, 2019 in-custody statement to Agent Rensch, the United States bears the burden of proving by a preponderance of the evidence that Mr. Chopra waived his *Miranda* rights and that the waiver was voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *see also United States v. Anaya*, 715 F.Supp.2d 916, 957 (D.S.D. 2010) (citing *Connelly*, "The government must prove that a waiver was voluntary, knowing, and intelligent by a preponderance of the evidence.").

A waiver of *Miranda* must be knowing, intelligent, and voluntary. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Woods*, 829 F.3d 675, 680 (8th Cir. 2016) (citation omitted). "[T]he waiver must have been made with a full awareness of both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. Reviewing courts must look to the totality of the circumstances surrounding the interrogation to answer these inquires. *Id.* "[A] valid waiver will not be presumed simply from

the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).  In *Woods*, the defendant's *Miranda* waiver was valid when he was read his *Miranda* rights, "acknowledged that he understood his rights, agreed to speak with the officers," and confessed.  829 F.3d at 680.

A valid waiver "may be made in writing on a printed format or it may be made orally by replying to questions . . . ."  *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976) (citations omitted).  However, "[t]he validity of a waiver is to be determined from all of the surrounding circumstances."  *Id.* (citation omitted).  There must be "evidence that the defendant knew and understood his rights, and voluntarily answered questions."  *Id.*  This requires two inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting *Moran*, 475 U.S. at 421).

The remedy for a *Miranda* violation is suppression.  *See United States v. Aguilar*, 384 F.3d 520, 527 (8th Cir. 2004) (affirming the district court's suppression of defendant's involuntary confession).

I. **Mr. Chopra's Statement Was Not Voluntary**

Whether a statement is voluntary is a separate question from whether a defendant was advised of, and waived, his *Miranda* rights.  *See, e.g.*, *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991).  "A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir.

2008) (quotation omitted). "In order to determine whether a confession was voluntary, we look to the 'totality of the circumstances and must determine whether the individual's will was overborne.'" *Id.* (quoting *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007)). The totality of the circumstances includes consideration of the defendant's personal history, level of education, and physical condition, as well as circumstances in which police officers elicited the statement. *See Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (evidence that an uneducated teenager was confined in a small, windowless room of a detention facility surrounded by officers is relevant to a consideration of the voluntariness of the defendant's confession). "Sleeplessness, alcohol use and drug use are relevant to our analysis, but '[i]ntoxication and fatigue do not automatically render a confession involuntary.' Instead, 'the test is whether these mental impairments caused the defendant's will to be overborne.'" *Gaddy*, 532 F.3d at 788 (quoting *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)).

In *Gaddy*, the defendant was "administered *Miranda* warnings" and the agent wrote the defendant's answers on the *Miranda* waiver form due to the defendant's hands being behind his back. 532 F.3d at 786. The waiver showed that the defendant "understood and waived his *Miranda* rights and was willing to make a statement." *Id.* About 40 minutes later, law enforcement asked him again if he wanted to give a statement, the defendant stated he did, and then he gave a statement. *Id.* The defendant argued for suppression of his statement, testifying that "he had not slept the night before the arrest," had taken medication and consumed alcohol, marijuana, and cocaine the day and night prior to the arrest. *Id.* He argued that due to the lack of sleep, the alcohol, and drugs, his *Miranda* waiver was not voluntary. *Id.* The district court denied the suppression motion. *Id.* The appellate court noted that the interviewing law enforcement officers testified that the defendant appeared awake and coherent, that the defendant

12

did not inform them that he was tired or intoxicated or under the influence of drugs, that the defendant acknowledged that he understood his *Miranda* rights, and that he wanted to give a statement. *Id.* at 788. Further, the evidence showed that the defendant was not confused or disoriented, was calm, quiet, compliant, and cooperative, and agreed a second time to give a statement about 40 minutes after the waiver. *Id.* The court specifically considered the fact that the defendant had "extensive contact with law enforcement" in the past. *Id.* at 789; *see also United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123–24 (8th Cir. 2001) (statement was voluntary due to, in part, the defendant's extensive prior contact with law enforcement). Thus, based on the totality of the circumstances, the *Miranda* waiver was voluntary. *Id.*

Here, Mr. Chopra was booked and fingerprinted, and then he was held for at least one hour prior to his statement while Agent Rensch interviewed the alleged victim (Tr. 32, 12–13). The first thing Mr. Chopra spoke of in the beginning of the interrogation was being claustrophobic in the small and tight room; the following exchange occurred:

> MR: [pause] Alright. [pause] Ok. I've got 8:29. [pause] I see you've got some water there. That's good. Do you need a refresher on that? You need some more water or anything?
>
> NC: I — I feel — I was feeling very claustrophobic in the room.
>
> MR: In, in this room?
>
> NC: Yeah.
>
> MR: Yeah, it's kind of a small room. Hopefully it's better now that we're in here with you, right?
>
> NC: Sure.
>
> MR: Or does it make it look, feel smaller? [laugh]
>
> NC: No, I'm . . . I'm stressed out.
>
> MR: Ok.

13

> NC: This is —
>
> MR: Alright, I'll, I won't keep you, we'll just get right to the point and just find out what happened, ok? Um, can you spell your last name for me?

(Exhibit 3, p. 2). Agent Rensch learned that Mr. Chopra had not slept much in the days prior, that he was tired, and that he was stressed (Tr. 36–37, 39–40, 41).

"[T]he test is whether these mental impairments caused the defendant's will to be overborne." *Gaddy*, 532 F.3d at 788 (citation omitted). In Mr. Chopra's case, Agent Rensch and Officer Annen knew that Mr. Chopra was not in the right mental state—he told them that he was claustrophobic and stressed out (Exhibit 3, p. 2). He told them he was exhausted (Tr. 41). Still, Agent Rensch read *Miranda* quickly (in 29 seconds) with the paper containing the rights angled toward himself, and then told Mr. Chopra to sign if he wanted to talk (Exhibit 3, p. 2). While Agent Rensch did read, "I have read this statement of my rights and I understand what my rights are, at this time, I'm willing to answer questions without a lawyer present" (Exhibit 3, p. 2), what Mr. Chopra heard just before he signed the form was:

> So why we're here today is because we want to find out why we're here. Why are we all here, what happened. Ok? Simple as that. Your side of the story. Alright? That's why I'm here, that's they came, they asked me to come out here and talk to you. So, if it's, ah, if you wanna talk to me about that, I just need you to sign right there…

(Exhibit 3, p. 2). Mr. Chopra signed on the signature line without asking questions, without hesitating, without asking for an attorney, and without asking that anything be repeated (Tr. 20–21).

The evidence shows that Mr. Chopra was so mentally impaired from travel and sleeplessness that he did not ask a single question about what he was signing, what rights he was giving up, or what could happen to him if he signed it. Nor did Agent Rensch ask Mr. Chopra if

he understood his rights and was willing to waive them.  He only explained to Mr. Chopra to sign if he wanted to talk.  For these reasons, the statement was not voluntary, and the statement must be suppressed.

## II.     **Mr. Chopra Did Not Knowingly and Intelligently Waive His *Miranda* Rights**

"[P]olice coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent."  *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C.Cir. 1991)) (emphasis in original).  Therefore, even if this Court finds that Mr. Chopra's will was not overborne, further inquiry is required.

With regard to whether Mr. Chopra made a knowing and intelligent waiver, "[a] waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right . . . "  *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005) (citation omitted).

In this case, Agent Rensch read the *Miranda* warning, which is transcribed below, but did not ask if Mr. Chopra understood his rights, and did not ask him if he waived his rights to give a statement:

> MR:    OK . . . so, today's date is April 8th, 2019, it is 8:28 p.m.  Alright.  So, before we ask you any questions, I'm going to read you your rights, okay? And let you know what those are.  I'm gonna read them to you, maybe you can just follow along . . . . before we ask you any questions you must understand your rights, you have the right to remain silent, anything you say can be used against you in court, you have a right to talk to a lawyer for advice before we ask you any questions, you have the right to have a lawyer with you during the questioning, if you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.  I have read this statement of my rights and I understand what my rights are, at this time, I'm willing to answer questions without a lawyer present.  So why we're here today is because we want to find out why we're here.  Why are we all here, what happened.

> Ok? Simple as that. Your side of the story. Alright? That's why I'm here, that's they came, they asked me to come out here and talk to you. So, if it's, ah, if you wanna talk to me about that, I just need you to sign right there…

NC:  Sure.

(Exhibit 3, p. 2). Agent Rensch merely read the statement to Mr. Chopra explained:

> So why we're here today is because we want to find out why we're here. Why are we all here, what happened. Ok? Simple as that. Your side of the story. Alright? That's why I'm here, that's they came, they asked me to come out here and talk to you. So, if it's, ah, if you wanna talk to me about that, I just need you to sign right there…

(Exhibit 3, p. 2). There was no discussion or even questions of whether Mr. Chopra understood the waiver nor whether he actually waived his *Miranda* rights:

> Q. Did you ever ask him is what I'm asking. Did you ever ask him, "Do you understand these *Miranda* rights?"
> A. No.
> Q. Did he ever tell you that he understood these rights?
> A. No.
> Q. He never told you that he did not want to speak with a lawyer, true? That's a poor question. You don't have to answer that.
>     You never actually asked him if he wanted to speak with an attorney, correct?
> A. No.
> Q. You never asked him if he was signing these documents voluntarily?
> A. No.
> Q. You never asked him if he waived these rights?
> A. Other than what is on the form, no.
> Q. You never -- he never, Mr. Chopra never verbally told you he was waiving these rights, correct?
> A. Not verbally.
> Q. The only thing you said is: "If you want to talk to me about that, I just need you to sign it right there," correct?
> A. Correct.
> Q. And then he quickly signed it?
> A. Yes.
> Q. Do you have any idea if he understood those Miranda rights that night?
> A. I believe that he did.
> Q. But you believe. You're assuming that, correct?
> A. Based on my experience, I believe that he understood the rights that evening.

16

> Q. But you don't know because you never asked him, true? You're speculating?
> A. I'm not speculating.
> Q. Could you read Mr. Chopra's mind?
> A. No.
> Q. So you don't know fully, with 100 percent confidence that he understood those rights?
> A. No.

(Tr. 43–45). Notably, Agent Rensch *read* the rights quickly and then *explained* to Mr. Chopra why he was there. There is nothing to suggest that Mr. Chopra knew he was waiving his rights; only that he was signing the document in order to talk to Agent Rensch.

The *Miranda* Court explained: "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise." *Miranda*, 384 U.S. at 467–68. Additionally, "[t]he warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." *Id.* at 469. The Court continued, "This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." *Id.*

There was no clear and unequivocal *explanation* to Mr. Chopra that he had the right to remain silent. There was no *explanation* that his statements would be used against him in court. Unlike *Gaddy* and *Gallardo-Marquez*, Mr. Chopra has no criminal history and had never been read *Miranda* before. There is no evidence that he knew the consequences of giving a statement to an FBI agent. In short, there is absolutely no *discussion* of a waiver. Mr. Chopra was shown a

sideways piece of paper that an FBI agent read aloud to him after he had traveled and not slept in days. He was told at the same time:

> So why we're here today is because we want to find out why we're here. Why are we all here, what happened. Ok? Simple as that. Your side of the story. Alright? That's why I'm here, that's they came, they asked me to come out here and talk to you. So, if it's, ah, if you wanna talk to me about that, I just need you to sign right there…

(Exhibit 3, p.2). This does not constitute a knowing and intelligent waiver of his rights.

## **CONCLUSION**

For the foregoing reasons, Mr. Chopra's statement should be suppressed.

Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**

Dated:   October 30, 2020

s/ Ryan Garry
Ryan P. Garry (Attorney No. 0336129)
Attorneys for Defendant
333 South Seventh Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com