# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 19-305 (NEB/BRT) |
| Plaintiff, | |
| | * PUBLIC * |
| v. | |
| | REPORT AND |
| Neeraj Chopra, | RECOMENDATION |
| Defendant. | |

Lauren Olivia Roso, Esq., Assistant United States Attorney, counsel for Plaintiff.

Ryan Patrick Garry, Esq., Ryan Garry, Attorney, LLC, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

On November 21, 2019, Defendant Neeraj Chopra was indicted on one count of abusive sexual contact on an aircraft in violation of 18 U.S.C. § 2244(b) and 49 U.S.C. §§ 46501(2)(A) and 46506(1). (Doc. No. 1.) This case is before the Court on Defendant's Motion to Suppress Statement (Doc. No. 21), specifically seeking suppression of the in-custody statement Defendant gave to FBI Special Agent Marc Rensch on April 8, 2019. Defendant asserts that the waiver of his *Miranda* rights was not knowing, intelligent, and voluntary. (Doc. No. 66, Def.'s Post-Hrg. Mem. in Supp. of Mot. to Suppress Statement ("Def.'s Mem.") 10–18.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. This Court held a motion hearing on October 2, 2020, at which FBI Special Agent Marc Rensch testified and three exhibits were received into evidence. (*See* Doc. Nos. 55, 57, 61.) Thereafter,

the parties filed post-hearing briefs. (Doc. Nos. 66, 67.) For the reasons stated below, this Court recommends that Defendant's motion be denied.

## BACKGROUND

Defendant Neeraj Chopra is charged with abusive sexual contact on an aircraft based on events that occurred on April 8, 2019. (Doc. No. 1, Indictment.) The Government alleges that during his flight from Boston, Massachusetts, to Minneapolis, Minnesota, Defendant engaged in non-consensual sexual contact with a minor by touching the minor's groin over his clothing. (*Id.*)

At the October 2, 2020 hearing before this Court, FBI Special Agent Marc Rensch[1] testified that after being notified by the Airport Police of an assault incident on a plane on the evening of April 8, 2019, he reported to Terminal 2 of the MSP Airport to investigate. (Doc. No. 61, 10/2/20 Hr'g Tr. ("Tr.") 11.) Upon arrival, airport police briefed Agent Rensch on what allegedly transpired on board the aircraft. (Tr. 12.) Agent Rensch met with the minor victim and his family for about an hour, and then he interviewed Defendant. (Tr. 12–13.)

Agent Rensch met with Defendant in an interview room at the Airport Police Operations Center.[2] (Tr. 13–14.) The room was small, carpeted, and had a metal locking

---

[1]   Special Agent Rensch has worked with the FBI for twenty-two years. (Tr. 10.) He has been assigned to the Minneapolis International Airport for approximately six years, and during that time has conducted approximately 100 witness and suspect interviews. (Tr. 10–11.)

[2]   This interview was recorded, and the video recording was received at the hearing as Exhibit 2. (Doc. No. 55, 10/2/20 Exhibit List.) The video has three segments; the interview of Defendant is contained on the second segment and begins at approximately

door with an interior window to the hallway; the room had no exterior windows. (Tr. 14.) Inside the room, there was a permanently affixed bench and table, and a removable chair. (*Id.*) Defendant was seated on the bench attached to the wall, not handcuffed; Agent Rensch sat opposite Defendant across the table and Airport Police Officer Abbie Annen sat on a chair next to Agent Rensch. (Tr. 15, 22; *see also* Hr'g Ex. 2.) Agent Rensch was not wearing a uniform. (Tr. 21.) He did have his FBI-issued handgun, but it remained holstered, and he at no time displayed it during the interview. (Tr. 21–22.) Officer Annen was wearing a uniform; although she likely was armed, she at no time displayed her weapon. (Tr. 46–47.) Agent Rensch testified that Defendant was not free to leave. (Tr. 34.)

After Agent Rensch entered the interview room, he introduced himself and showed his FBI credentials. (Tr. 16.) Immediately after introducing himself, Agent Rensch turned on a recording device and advised Defendant of his *Miranda* rights by using a form.[3] (Tr. 17; *see* Hr'g Ex. 2.) Agent Rensch took the form out of his briefcase, placed it on the table between Defendant and himself, referred to it as his advice of rights, and informed Defendant that he was going to read the advice of rights to him. (Tr. 17–18.) Agent Rensch turned the form sideways so that Defendant could look and read along with Agent Rensch as the rights were read aloud to him. (Tr. 18.) Agent Rensch read the

---

the 10 minute 14 second mark of the second segment. The transcribed interview was received as Exhibit 3. (*Id.*)

[3]   The signed form used to read the *Miranda* rights was received at the hearing as Exhibit 1. (Doc. No. 55, 10/2/20 Exhibit List.)

form verbatim and pointed to each sentence as he read it. (Tr. 18.) The form stated, and Agent Rensch read, as follows:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during the questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions without a lawyer present, you have the right to stop answering at any time.

(Tr. 18–19; 10/2/20 Hr'g Ex. 1.) Agent Rensch testified that he understood Defendant to be literate in English and it appeared that Defendant followed along as he read these rights and that he was tracking what Agent Rensch said. (Tr. 18–19, 50.) At the bottom of the form were lines next to a signature line which he also read, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Tr. 20; 10/2/20 Hr'g Ex. 1.) Agent Rensch then took a few extra seconds to explain to Defendant why they were there, that they would like to hear his side of the story, and that if he would like to speak with them, he would need to sign there on the line; he placed an "X" on the signature line to show Defendant exactly where to sign. (Tr. 20.) Without any hesitation, and without asking any questions or for an attorney, Defendant then signed the form. (Tr. 20.)

Before asking any interview questions, Agent Rensch first acknowledged that Defendant had a cup of water in front of him and asked Defendant whether he needed more water, to which Defendant replied no. (Tr. 23; *see also* Hr'g Ex. 2.) Agent Rensch described Defendant as attentive, making eye contact, and not appearing surprised as to why they were interviewing him. (Tr. 16.) He also described Defendant as appearing "nervous," which "is common and to be expected in that situation or environment," and that Defendant stated that he felt claustrophobic and "stressed" or "stressed out." (Tr. 22.) Agent Rensch testified that his own demeanor and tone of voice while meeting with Defendant were relaxed and not intimidating. (Tr. 21.)

During the interview, Defendant informed Agent Rensch that he had been very tired[4] on the plane when the alleged incident occurred and that it was an accident. (Tr. 24; *see* Hr'g Ex. 2.) Agent Rensch testified that Defendant, however, did not appear visibly tired, but instead was engaged in Agent Rensch's questions (i.e., he maintained a good posture, eye contact, and did not seem confused or disoriented, and did not appear sleepy or tired). (Tr. 24–26, 51.) Agent Rensch stated that Defendant did not hesitate before answering any of the questions, he did not ask for a break, his responses to the questions made sense, and he did not ever say that he did not understand a question. (Tr. 25, 27–28.) The entirety of the interview lasted approximately thirty minutes. (Tr. 27.)

---

[4] Defendant told Agent Rensch that he was up late on Saturday night at a friend's birthday party, he went to the airport in D.C. after classes on Sunday, his flight was delayed and he ended up staying overnight at the airport in D.C. on Sunday night, he flew from D.C. to Boston early on Monday morning, and then flew from Boston to Minneapolis on Monday afternoon. (Tr. 39–40.)

5

## DISCUSSION

Defendant moves to suppress the statements he made to FBI Special Agent Marc Rensch on April 8, 2019, in an interview room at the Airport Police Operations Center, Terminal 2, Minneapolis International Airport. Defendant argues that the statements cannot be used against him at trial because his mental state at the time the statements were made—impaired from travel and sleeplessness—prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights. (Doc. No. 66, Def.'s Mem. 11–18.) The Government disagrees and contends that the Defendant validly waived his *Miranda* rights. (Doc. No. 67, Gov't's Post-Hearing Resp. to Def.'s Mot. to Suppress ("Gov't's Mem.") 9–14.)

Generally, because the Fifth Amendment protects a person's right not to be compelled to incriminate himself, the government cannot use an individual's statements against him at trial if those statements were made during a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966). However, if the government provides a proper *Miranda* warning prior to a custodial interrogation, and an individual waives his *Miranda* rights knowingly, intelligently, and voluntarily, that person's statements may be used against him at trial. *See United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). For the statements to be used against him, a defendant's waiver "'must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In addition, the defendant "must have waived his rights 'with a full awareness of the right being abandoned and the consequences of the decision to abandon it.'" *Id.*

6

(quoting *Moran*, 475 U.S. at 421). To decide whether a purported waiver of rights is knowing, intelligent, and voluntary, courts consider the totality of the circumstances. *Id.* The Government bears the burden of showing the validity of the *Miranda* waiver by a preponderance of the evidence. *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

On the first question in the waiver analysis—whether the waiver was voluntary—the evidence in the record demonstrates that there was no intimidation, coercion, or threatening conduct by either FBI Special Agent Marc Rensch or Airport Police Officer Abbie Annen prior to or during Defendant's questioning at the airport. The testimony from Special Agent Rensch is consistent with the interview video showing that Defendant spoke willingly to Special Agent Rensch after he signed the Advice of Rights form. The atmosphere of the interview was cooperative and calm. Special Agent Rensch maintained a relaxed demeanor, was not overly confrontational, and did not raise his voice. These facts show that Defendant's waiver was the product of his free and deliberate choice to speak with Special Agent Rensch rather than any intimidation, coercion, or deception (i.e., it was voluntary).

The preponderance of the evidence also shows that Defendant provided the waiver with full awareness of the right being abandoned and the consequences of the decision to abandon it. Immediately upon entering the interview room, Special Agent Rensch identified himself as an FBI agent and explained why he was there; Defendant did not seem confused as to why he was being interviewed. Special Agent Rensch read the Advice of Rights form aloud—which included both an iteration of Defendant's *Miranda*

7

rights and the consequences of giving up those rights—while Defendant followed along. Defendant did not express any confusion regarding his rights. Special Agent Rensch also read aloud the acknowledgment line at the end of the form, paused to tell Defendant why they were there again, and then told Defendant that if he wanted to talk he would need to sign the form. Defendant then signed the form with no hesitation. Although there is no evidence that Defendant had any prior experience with law enforcement or the waiving of *Miranda* rights, there is evidence that Defendant is an English-speaking educated adult currently taking MBA graduate student courses at Cornell. (Tr. 36.) There is no evidence that Defendant exhibited any inability to understand his rights as they were read to him by Special Agent Rensch or the consequences of deciding to continue the interview.

Defendant contends that his diminished mental capacity based on lack of sleep prevented Defendant from making a knowing, intelligent, and voluntary waiver of his *Miranda* rights. However, "[e]ven if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect . . . a *Miranda* waiver will not be invalidated on that basis if there is no evidence of police coercion." *Vinton*, 631 F.3d at 483; *see also United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (finding *Miranda* waivers valid and noting the court had upheld a similar conclusion where the suspect "had recently used methamphetamine and had not slept for five days . . . where law enforcement had no knowledge of the alleged impairment and the suspect did not act intoxicated") (citing *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)). As discussed above, there is no evidence in the record that any law enforcement coercion occurred here. And the evidence that Defendant had any diminished capacity is itself

inconclusive and rebutted by Defendant's attentiveness during the meeting, and the ability to interact and answer the questions from Special Agent Rensch in a rational and logical fashion.

Other than referring to Defendant's statement that he was stressed, and his later statements—after the waiver was signed—regarding his travel over the preceding few days and reference to him being tired, Defendant presented no evidence that he was not capable of voluntarily waiving his *Miranda* rights or completing the interview because he was too tired or exhausted. The Government, on the other hand, has provided evidence showing that Defendant was able to understand both the rights he was advised of and the consequences of agreeing to talk to Special Agent Rensch about the incident reported. The lack of evidence to the contrary is fatal to Defendant's motion to suppress his statements.

Further, the law does not require a government agent to conduct an exhaustive investigation into a suspect's mental state before obtaining a valid waiver of his *Miranda* rights. *See, e.g.*, *United States v. Perez*, No. CR. 08-50033-KES, 2009 WL363618, at *10 (D.S.D. Feb. 12, 2009) (noting the absence of any authority that a government agent has a duty to perform testing of the defendant to rule out whether the defendant was intellectually impaired, under the influence of a chemical substance or sleep-deprived for a waiver of *Miranda* rights to be valid "particularly where . . . there was no outward indication that [the defendant] was impaired in any way"); *see also United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) ("[N]either exhaustion nor intoxication will necessarily invalidate a *Miranda* waiver."). "Instead, the test is whether these mental

9

impairments cause the defendant's will to be overborne." *United States v. Annis*, 446 F.3d 852, 855 (8th Cir. 2006) (internal quotations omitted). Here, there is no evidence in the record showing that Defendant's will was overborne due to fatigue. Instead, Special Agent Rensch's testimony and video evidence show that Defendant exhibited no signs of being overly tired and that he was engaged and responsive throughout. Because this Court concludes that based on the preponderance of the evidence, Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, using Defendant's statements at trial will not violate his Fifth Amendment rights. Therefore, this Court recommends that Defendant's motion be denied.

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statement (Doc. No. 21) be **DENIED**.

Dated: December 14, 2020

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **December 28, 2020**. A party may respond to those objections by **January 11, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report

will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.