UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-CR-305 (NEB/BRT)

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

NEERAJ CHOPRA,

      Defendant.

**GOVERNMENT'S TRIAL BRIEF**

The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Lauren O. Roso and Michelle E. Jones, Assistant United States Attorneys, hereby submits this trial brief outlining the evidence the government intends to introduce at trial and in support of the government's motions *in limine*. The government respectfully reserves the right to supplement its trial brief and motions *in limine* in advance of trial in response to further witness interviews or the defendant's motions.

Defendant Neeraj Chopra is charged by indictment with one count of abusive sexual contact, in violation of 18 U.S.C. § 2244(b) and 49 U.S.C. §§ 46501(2)(A) and 46506(1), for sexually touching a 16-year-old victim on a flight from Boston to Minneapolis in April 2019. The elements of this offense are: (1) the defendant knowingly engaged in sexual contact with the victim; (2) the sexual contact was without the victim's permission; and (3) the defendant's actions took place within the special maritime and territorial jurisdiction of the United States. *See United States v. Hummingbird*, 743 F.3d 636, 637 (8th Cir. 2014);

*see also United States v. Erramilli*, 788 F.3d 723, 728 (7th Cir. 2015); *United States v. Healy*, 583 F. App'x 661, 662 (9th Cir. 2014).

Below is a summary of the anticipated evidence at trial, the government's motions *in limine*, and an overview of evidentiary issues that may arise.

**I.     SUMMARY OF ANTICIPATED EVIDENCE AT TRIAL**

In April 2019, N.F., who was then 16 years old, was travelling home to Minnesota from a hockey tournament in Buffalo, New York with his family.  The family was aboard Jet Blue Flight 1735 from Boston to Minneapolis, though the family members' seats were scattered throughout the plane.  N.F. was seated in 16A (a window seat), while his brother, C.F., was seated directly in front of him in 15A, and their father, P.F., was seated in 14A.  The defendant was seated in 16B, the middle seat next to N.F.  A male passenger was initially seated in 16C (the aisle seat) but left his seat at some point during the flight and did not return.

*The Defendant's Interactions with N.F. During the Flight*

Upon boarding the plane, N.F. took his window seat in Row 16 and put in his headphones to listen to music.  The defendant boarded after N.F. and sat next to N.F.  At some point in the flight, the defendant retrieved a blanket from his backpack and draped it over his lap.  A portion of the blanket also covered N.F.'s right leg.  The defendant moved his leg closer to N.F.'s, and, with his arm under the blanket, placed his hand on N.F.'s right knee and leg.  The defendant moved closer to N.F. as he touched N.F.'s leg, and N.F. asked the defendant to move over, stating something like, "Do you mind?"  The defendant apologized to N.F. and removed his arm and hand from N.F.'s knee and leg.

The defendant then began a conversation with N.F. and asked N.F. what he did for a living. N.F. explained that he was a high school student, and the defendant volunteered that he worked in IT and lived in Minneapolis. During their conversation, the defendant showed N.F. some photos and videos on his phone of the defendant and his friends partying, and suggested that the defendant and N.F. should get together sometime to hang out. The defendant provided N.F. his name and phone number, and while N.F. agreed to exchange contact information, he provided the defendant a fake name and phone number as he felt uncomfortable sharing his actual contact information.

N.F. recalled noticing the defendant lower his tray table and rest his head on it, while the blanket was still over the defendant's lap. N.F. then replaced his headphones and closed his eyes. The defendant put his left arm and hand under the blanket and again moved it to N.F.'s right knee and leg. N.F. took two photographs on his iPhone depicting the defendant's arm and hand under the blanket, touching N.F.'s knee and inner thigh. The defendant continued to feel N.F.'s knee and inner thigh until N.F. eventually told the defendant something to the effect of "cut it out." The defendant again apologized and moved his arm.

After another 10-15 minutes, the defendant again rested his head on the lowered tray table and moved his arm and hand back to N.F.'s right leg under the blanket. While the defendant moved his hand from N.F.'s knee to his inner thigh, N.F. took a third photo on his phone showing the defendant's forearm resting on his leg, with the defendant's elbow in his crotch and hand on his inner thigh. N.F. became even more uncomfortable and scared and began to cry.

*N.F.'s Communications with C.F. and P.F. Regarding the Defendant*

During this time N.F. tried to text his brother, C.F., that he was becoming increasingly uncomfortable, but the messages would not go through. Instead, N.F. tried to get his brother's attention by tapping him on the shoulder, but his brother was sleeping and slow to respond. He continued to aggressively tap his brother's shoulder and finally managed to get his attention.

When C.F. turned around, he saw N.F. had a panicked look on his face and was crying. Not understanding what was wrong with his brother, and seeing a man slumped over next to him, C.F. and their father, P.F., called the flight attendant to check on the defendant. When the flight attendant responded to Row 16 and asked the defendant if he was alright, the defendant responded that he was.[1] In responding to the flight attendant's question, the defendant raised his head and removed his arm from under the blanket, moving his left hand up N.F.'s inner thigh and over N.F.'s groin while doing so.

After the flight attendant left, N.F. and C.F. passed C.F.'s phone back and forth and typed messages to each other in the iPhone Notes application. N.F. explained what was happening, and C.F. became very concerned for his brother.[2] C.F. then communicated with P.F., their father, who was seated just in front of C.F., that the man next to N.F. "kept touching [N.F.] inappropriately." This communication also occurred using the iPhone Notes application. C.F. and P.F. agreed that the defendant should move to the empty seat

---

[1] The flight attendant later reported that she did not need to wake the defendant.
[2] The brothers erased their notes as they had cursed and used inappropriate language about what happened to N.F.

4

in Row 16 and one of them should switch seats with N.F.

C.F. told the defendant to move to the vacant aisle seat in Row 16 and the defendant agreed. C.F. then switched seats with N.F. The defendant tried to apologize to C.F., but C.F. told him to be quiet. When the plane landed, C.F. had the defendant remain seated while the other passengers exited the plane, and the two deplaned together.

Shortly after the plane landed, P.F. sent N.F. a text message asking what had happened on the plane. N.F. indicated that he would tell his father later, and that N.F. would take care of it.

*Defendant's Statement to FBI*

The defendant provided a statement to FBI Special Agent Marc Rensch after the plane landed and the defendant deplaned. Agent Rensch read the defendant his *Miranda* rights, and the defendant voluntarily signed a *Miranda* waiver and agreed to speak with Agent Rensch.

During the interview, the defendant admitted that he "touched [N.F.] inappropriately" during the flight. He further admitted that this touching happened more than once, though he claimed that the touching was accidental. When asked specifically if his hand ever touched N.F.'s penis, the defendant stated, "I don't remember."

**II.    GOVERNMENT'S MOTIONS *IN LIMINE***

    **A.    Motion to Sequester Witnesses**

The government moves to sequester potential witnesses except for the government's case agent, Federal Bureau of Investigation Special Agent Marc Rensch. Federal Rule of Evidence 615 allows the exclusion of witnesses at the "request of a party." This rule does

not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present. Government agents and expert witnesses fall within the exceptions to this rule. *United States v. Sykes*, 977 F.2d 1242, 1245 (8th Cir. 1992); *United States v. Conners*, 894 F.2d 987, 991 (8th Cir. 1990).

### B. Motion to Preclude Mention of Punishment and Collateral Consequences of Conviction to the Jury

The government moves to preclude the defendant from making any reference to any sentence he may receive if convicted at trial, or any collateral consequences that may follow. It is improper for either the defense or prosecution to comment or argue the potential punishment and collateral consequences of a conviction in the presence of the jury. "The argument of counsel, generally speaking, should be confined to the evidence that has been produced and to such inferences as may reasonably be drawn therefrom." *Brennan v. United States*, 240 F.2d 253, 263 (8th Cir. 1957). The jury will be instructed that punishment and the consequences of conviction, if any, are solely the province of the Court. The Court should preclude any reference to potential punishment or collateral consequences of conviction.

### C. Motion to Preclude Defendant from Offering Self-serving Hearsay

The government further requests that the Court prevent the defendant from referring to his own hearsay statements. It is well established that, although a defendant's own out-of-court statements may be admitted against him as an admission by a party-opponent, *see*

Fed. R. Evid. 801(d)(2)(A), he may not offer his own self-serving exculpatory hearsay statements. *See United States v. Waters*, 194 F.3d 926, 930-31 (8th Cir. 1999) (district court properly refused to admit defendant's prior exculpatory statements made during polygraph examination); *see also United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (defendant's own statements in deposition inadmissible hearsay); *United States v. Waters*, 627 F.3d 345, 358 (9th Cir. 2010) (statement by defendant to relative regarding innocence was hearsay); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("[D]uring direct examination, the government could have introduced inculpatory statements made by [the defendant]. The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party.").

If the defendant wishes to explain his version of events to the jury, he may do so by testifying. He may not, however, make an "end-run" around the Federal Rules of Evidence to achieve the same goal without running the risks inherent in testifying. *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) ("[I]f such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."). His prior statements are inadmissible hearsay if offered by the defense.

Should the defendant have an alternative theory of admissibility for the use of such statements, the government respectfully requests that the Court require him to raise it outside the hearing of the jury prior to their use.

D.     **Motion to Exclude Inadmissible "Character" Witness Testimony**

The defendant has provided a witness list with five individuals who appear to be his friends or associates. To date, the government has not received summaries or transcripts of witness statements to a defense investigator, nor has it received other reciprocal discovery as to these defense witnesses. Because it lacks specific information regarding the content of the witnesses' anticipated testimony, the government does not know if the witness testimony falls within the class of testimony admissible under Fed. R. Evid. 404 and 405.

Rule 404(a) prohibits the use of character evidence unless offered to prove "the defendant's pertinent trait," which the government "may offer evidence to rebut." Fed. R. Evid. 404(a)(1), (2)(A). Rule 405 limits testimony about the defendant's character to reputation or opinion testimony unless "a person's character or character trait is an essential element of a charge, claim, or defense." Absent such a showing, specific instances of the defendant's conduct may only be described by the government on cross-examination. Fed. R. Evid. 405(a); *United States v. Monteleone*, 77 F.3d 1086, 1089 (8th Cir. 1996).

The defendant has not identified any character trait that would be pertinent to the offense, much less one that qualifies as "an essential element" under Rule 405(b). Accordingly, the government moves to exclude all character witness testimony not related to a pertinent trait, and all defense witness testimony regarding specific instances of the defendant's good conduct.

Moreover, the defendant cannot seek to establish his innocence by proof of his failure to commit criminal acts on other occasions. *United States v. Scarpa*, 897 F.2d 63,

70 (2d Cir. 1990) (citing *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978)); *see also, e.g.*, *United States v. Hill*, 40 F.3d 164, 169 (7th Cir. 1994) (affirming exclusion of evidence that defendant did not steal "test letters" planted by law enforcement in mail theft prosecution). Law-abiding behavior at one time is irrelevant to commission of a criminal offense on another occasion and therefore inadmissible. Fed. R. Evid. 402.

Use of specific good acts to prove lack of criminal intent is likewise impermissible under Rules 401, 404, and 405 because such evidence is simply not relevant to whether the defendant committed the charged crimes. *United States v. Ellisor*, 522 F.3d 1255, 1270-71 (11th Cir. 2008) (quoting *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991)) ("'[E]vidence of good conduct is not admissible to negate criminal intent[.]"); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").

Additionally, the defendant has provided no notice of intent to use evidence under Fed. R. Evid. 404(b), which would nonetheless be inadmissible to show a predisposition not to commit the charged offense. The government respectfully requests that the Court preclude the defendant from offering such evidence at trial.

### III.   POTENTIAL EVIDENTIARY ISSUES AT TRIAL

The government may seek to offer three pieces of evidence that the defendant may challenge as inadmissible hearsay: (1) testimony regarding N.F.'s communications with C.F. during and immediately after the sexual touching; (2) a screenshot of the iPhone Notes application communications between C.F. and P.F., and (3) a brief text message exchange

between N.F. and P.F. after the plane landed.

As further described below, the Court should allow this evidence as non-hearsay as the communications are not offered for the truth of the matter asserted, but rather to demonstrate that N.F. attempted to alert, and eventually alerted, his family about the defendant touching him, as well as the effect such information had on C.F. and P.F. Should the Court disagree and find that this is hearsay evidence, the Court should nevertheless admit the generalized content of the communications under the present sense impression, excited utterance, and then-existing state of mind exceptions to the rule against hearsay. A limiting instruction should address any concern that the jury will consider such evidence for impermissible purposes. *See United States v. Darden*, 70 F.3d 1507, 1538 (8th Cir. 1995) ("[L]imiting instructions help[] confine the jury's use of the evidence . . . to the purposes for which that evidence was offered."); *see also* Joint Proposed Jury Instructions 5, 15.

Federal Rule of Evidence 801(c) defines hearsay as an individual's out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." A "statement" can be a person's oral assertion, written assertion, or non-verbal conduct, provided the person intended the conduct as an assertion. Fed. R. Evid. 801(a). Importantly, an individual's out-of-court statement is not hearsay if it is offered for a purpose other than "the truth of the matter asserted." *See United States v. Earth*, 984 F.3d 1289, 1294 (8th Cir. 2021) (quoting *United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) ("[A] statement offered to show its effect on the listener is not hearsay."); *United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) (quoting G. Michael Fenner, *The*

10

*Hearsay Rule* 31 (2003)) ("When an out-of-court statement has relevance when we only consider the effect it had on those who heard (or read) it—not whether the statement was true or not, but just its effect on those who heard it—then the statement is not hearsay."); *United States v. Running Horse*, 175 F.3d 635, 638 (8th Cir. 1999) (holding that information concerning why a witness acted the way they did, admitted only for that purpose, is not hearsay); *United States v. Roberts*, 676 F.2d 1185, 1188 (8th Cir. 1982) (testimony not hearsay when offered to explain motive, state of mind, and subsequent conduct).

Certain statements, even if they do constitute hearsay, are nevertheless admissible as exceptions to the rule against hearsay as they possess circumstantial guarantees of trustworthiness. *See* Fed. R. Evid. 803. For example, a declarant's "present sense impression" is excepted from the rule against hearsay when (1) the statement describes an event or condition, and (2) it is made while or immediately after the declarant perceived it. Fed. R. Evid. 803(1). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication." *United States v. Dean*, 823 F.3d 422, 427 (8th Cir. 2016).

Similarly, an individual's "excited utterance" is admissible where (1) the statement relates to a startling event or condition, and (2) it was made while the declarant was under the stress or excitement that it caused. Fed. R. Evid. 803(2). "The rationale of the excited utterance exception is that the stress of nervous excitement or physical shock stills the reflective faculties, thus removing an impediment to truthfulness." *United States*

*v. DeMarce*, 564 F.3d 989, 997 (8th Cir. 2009); *see also Earth*, 984 F.3d at 1297 (finding excited utterance under Fed. R. Evid. 803(2) admissible where "statement relat[ed] to a startling event or condition" and was made "while the declarant was under the stress of excitement that it caused").

Finally, a statement of the declarant's then-existing state of mind, or emotional or physical condition, is also excepted from the rule against hearsay. Fed. R. Evid. 803(3). Statements made contemporaneously with a declarant's state of mind, emotion, or condition contain "[a] key circumstantial guarantee of trustworthiness" such that it need not be excluded under the rule against hearsay. *United States v. Barraza*, 576 F.3d 798, 804-05 (8th Cir. 2009).

### A. In-flight Communications Between N.F. and C.F.

N.F. attempted to communicate with C.F. multiple times during and immediately after the defendant sexually touched N.F. First, he attempted to send text messages to C.F. explaining what was happening. Second, after the flight attendant checked on the defendant and the defendant touched N.F.'s groin over his clothing, N.F. and C.F. passed C.F.'s phone back and forth, writing messages to one another in the iPhone Notes application regarding the defendant's actions. The Court should allow testimony about both the fact of the text messages and the notes, as well as the general nature of those communications.

The fact that N.F. attempted to send text messages to his brother and communicated with his brother over the Notes application is not hearsay. Instead, it is a physical and verbal act that has value precisely because N.F. reached out to C.F. to express his fear and

12

discomfort. *See United States v. Amahia*, 825 F.2d 177, 181 (8th Cir. 1987) (statement not hearsay where "the fact of the statement, not its truth, is important"); *United States v. Lindsey*, 702 F.3d 1092, 1101 (8th Cir. 2013) (verbal act not hearsay because not offered to prove its truth, but to show that the act occurred). Testimony regarding these attempted messages and notes will help the jury understand N.F.'s state of mind and help explain C.F.'s subsequent actions.

Moreover, the content of the attempted text messages and the notes are admissible for similar reasons. While the brothers ultimately erased the notes they passed to each other, C.F. and N.F. should be able to testify generally about what was said for the purpose of explaining the effect the messages had on C.F. and C.F.'s later actions. *See Roberts*, 676 F.2d at 1188 (holding that out-of-court statements offered to explain subsequent conduct of lay witness should have been admitted as non-hearsay).

N.F. should also be allowed to testify in general terms about the content of his attempted and actual communications with C.F. as the statements are present sense impressions, excited utterances, and statements about N.F.'s then-existing state of mind, all of which contain circumstantial guarantees of trustworthiness such that exclusion is not warranted under the rule against hearsay. *See* Fed. R. Evid. 803(1)-(3). N.F.'s attempted text messages to C.F. explained what he was experiencing and how it made him feel.[3] N.F. tried to send these messages while the defendant was touching him, and while he was experiencing a heightened level of fear and discomfort. *See United States v. Dean*, 823

---

[3] FBI Forensic Accountant Vicki Klemz will testify that the attempted text messages could not be recovered during the forensic analysis of N.F.'s iPhone.

F.3d 422, 427 (8th Cir. 2016) (present sense impression admissible where victim described assault in detail, made the call while she was still bleeding from the assault, and made the statement while she was visibly upset and injured).

The notes exchanged between N.F. and C.F. also contain N.F.'s admissible excited utterances. As the Eighth Circuit described in *United States v. Demery*, 674 F.3d 776, 881 (8th Cir. 2011):

> In determining whether a declarant was under the stress of excitement caused by a startling event when she made a statement, we consider the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement. We also examine whether the declarant's stress or excitement was continuous from the time of the event until the time of the statements.

(internal quotations omitted); *see also United States v. Bercier*, 506 F.3d 625, 630 (8th Cir. 2007) (statements made by victim 30 minutes after incident admissible excited utterance where the victim's "condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation").

Here, N.F. exchanged notes with C.F. immediately after the defendant touched his inner thigh for the second time and touched his groin over his clothing. Such contact was obviously disturbing for 16-year-old N.F., who was panicked and crying when he finally got C.F.'s attention. While the defendant may have moved his arm and hand by the time the brothers exchanged notes, N.F. was still seated immediately next to the defendant aboard a cramped airplane where it was difficult to remove himself from the situation. Under these circumstances, N.F. had little opportunity or motive to be untruthful and his

14

statements to C.F. carry the requisite circumstantial guarantees of trustworthiness.

  B.  **In-flight Communications Between C.F. and P.F.**

As described above, the victim's brother (C.F.) and father (P.F.) communicated via the iPhone Notes application about the defendant touching N.F. shortly after the flight attendant was called to check on the defendant. Specifically, C.F. told P.F. that "the guy next to [N.F.] kept touching him inappropriately," and the two discussed switching seats with N.F.

This exchange is admissible as the government does not intend to offer the statements for the truth of the matter asserted, but rather to explain C.F. and P.F.'s actions after they were informed of the defendant's actions. This dialogue helps explain why C.F. switched seats with N.F., and why P.F. became increasingly concerned about N.F. and asked him what happened once the plane landed (Subsection C below). *See Running Horse*, 175 F.3d at 638 (admitting as non-hearsay background information to assist the jury in understanding subsequent law enforcement actions); *Malik*, 345 F.3d at 1001-02 (affirming admissibility of an informant's statement where statement explained officer conduct and bolstered officer credibility, especially where court issued limiting instruction).

  C.  **Text Message Exchange Between N.F. and P.F.**

Once the plane landed and cellphone reception resumed, P.F. sent N.F. a text message asking him what happened during the flight. N.F. replied that he would "tell P.F. later." P.F. replied that he "may want to deal with it now," but N.F. informed P.F. that N.F. would take care of it.

The content of this communication does address what actually happened to N.F., but rather confirms that N.F. communicated his concerns to his family, and that N.F.'s family wished to deal with the serious matter promptly. Because the text exchange is not offered for the truth of the matter asserted—i.e., whether N.F. would in fact tell his father later, or whether he would handle the matter—but instead to show the fact of the communication, N.F.'s then-existing state of mind, and P.F.'s reaction and state of mind, it is not inadmissible hearsay under Fed. R. Evid. 801(c).

Dated: June 11, 2021                                Respectfully submitted,

                                                    W. ANDERS FOLK
                                                    Acting United States Attorney

                                                    s/ *Lauren O. Roso*

                                                    _____
                                            BY:     LAUREN O. ROSO and
                                                    MICHELLE E. JONES
                                                    Assistant United States Attorneys